**FILED**
**NOVEMBER 23, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **TERRY CARTER** | ) | **Case No.** |
| | ) | |
| Plaintiff, | ) | **Judge** _____ |
| | ) | |
| v. | ) | **Magistrate Judge** _____ |
| | ) | |
| **TRANSIT TELEVISION NETWORK,** | ) | **JURY TRIAL DEMANDED** |
| **A WHOLLY OWNED SUBSIDIARY** | ) | |
| **OF TORSTAR CORPORATION** | ) | |
| | ) | |
| Defendant. | ) | |

**07 C 6608**

**JUDGE LEINENWEBER**
**MAGISTRATE JUDGE NOLAN**

## COMPLAINT

Plaintiff, Terry Carter, by and through her attorneys, Stowell & Friedman, Ltd., for her Complaint against Transit Television Network (hereinafter "Defendant" or "TTN") states as follows:

### JURISDICTION

1. Jurisdiction is based on 28 U.S.C. §§1331 and 1343, as well as Title VII of the Civil Rights Act of 1964 (as amended) ("Title VII"), Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981, as amended ("Section 1981"), and the Equal Pay Act provisions of the Fair Labor Standards Act ("the Equal Pay Act").

### PARTIES

2. Plaintiff Terry Carter ("Carter" or "Plaintiff"), an African American woman, is a former employee of Defendant TTN, formerly located in Chicago, Illinois. Plaintiff resides in this judicial district and was employed by TTN in this district. Plaintiff has exhausted her administrative remedies with the Equal Employment Opportunity Commission ("EEOC") and has received a Right to Sue TTN in federal court.

3. TTN, headquartered in Orlando, Florida, is the largest out-of-home digital network providing information, entertainment and advertising to transit riders across North America. TTN is the largest out-of-home network of its kind and one of the largest in the world. TTN is a wholly owned subsidiary of Torstar Corporation, a broadly based media company listed in the Toronto Stock Exchange (TS.B) with annual revenues in excess of $1B. TTN's website states that it is currently doing business in Atlanta, Chicago, Los Angeles, Orlando, Milwaukee and San Diego and is continuing to expand into additional North American markets.

4. Upon information and belief, TTN closed its offices in Milwaukee, WI and Chicago, IL in the Summer of 2007.

## FACTUAL ALLEGATIONS

5. From approximately September 8, 2006 until the Chicago TTN office closed in the Summer of 2007, Plaintiff worked as an Account Executive. During this time, Plaintiff reported directly to Office Manager Matt Langan ("Langan"), a Caucasian man, and later, to James Harder ("Harder"), who is also a Caucasian man.

6. TTN's Human Resources Department is run remotely from Orlando, Florida and headed by Norma Shaffer ("Schaffer"), a Caucasian woman.

7. Throughout her employment, Plaintiff discharged all duties assigned to her competently. Plaintiff did not receive performance reviews until after she complained of discrimination and, accordingly, those reviews were riddled with discriminatory animus towards Plaintiff. However, prior to that point, Plaintiff was told by Langan that she was meeting or exceeding TTN's expectations.

8. Notwithstanding her job performance, Plaintiff was subjected to sex discrimination, racial discrimination, and retaliation during her employment with TTN. Plaintiff experienced a

culture at TTN where managers and employees alike maintain stereotypical views about African Americans and women that create a work environment where occupational segregation, disparate treatment, harassment, and retaliation are condoned.

9. Complicit in TTN's unlawful conduct is its Human Resources Department, run by Schaffer, which is ineffective at resolving complaints of discrimination and is even frequently involved in acts of discrimination and retaliation.

10. In December 2006 and January 2007, Plaintiff formally complained of discrimination within TTN through the proper channels. On February 7, 2007, Plaintiff formally filed her Charge of Discrimination with the EEOC. After complaining within TTN and filing her Charge of Discrimination, Complainant suffered harassment and increased scrutiny of her job performance in retaliation for lodging her formal complaints.

**Plaintiff Was A Victim Of TTN's Unlawful Discrimination And Retaliation**

11. Although Plaintiff was hired with the understanding that she lived in the Chicago South suburbs and would canvas that area as well as Greater Chicago for potential clients that would advertise with TTN, Plaintiff came to learn that TTN was not interested in minority clients.

12. Indeed, Plaintiff lived in Olympia Fields, Illinois and knew that there were many great businesses in Chicago suburbs like Flossmoor, Orland Park, Frankfort, Matteson, Hazel Crest, Country Club Hills and Mokena that would respond favorably to the type of advertising TTN and Plaintiff had to offer.

13. This was not a novel approach, and Plaintiff knew of other successful Account Executives throughout the country that targeted certain geographic regions in order to become the "go-to" person in that area for TTN's unique services.

14. Nonetheless, Plaintiff was often questioned by Langan about why she was spending her time in the South suburbs. In referring to business meetings and appointments she had taken with South Suburban businesses, Langan would often question the "quality" of the potential accounts.

15. Plaintiff was not aware of instances in which Langan questioned the "quality" of an account other than when he criticized Plaintiff's pitches to minority–owned companies or companies in areas known to have greater minority populations. Plaintiff often heard Langan and other Account Executives talk about bringing "the accounts in the door" because TTN was a fledgling company that needed to increase its numbers in the region. However, it was only when Plaintiff spoke about her business plan, meetings and appointments with minority–owned companies or companies in areas known to have greater minority populations that the issue of "quality" came into the equation.

16. Further, sometime during the latter part of 2006, the Director of Network Sales, James Atkinson (male, non-African-American) commented that Plaintiff was "wasting time and resources" by trying to prospect furrier clients to advertise with TTN because the audience was primarily Hispanic and African-American and they could not afford the merchandise, or words to that affect. When Plaintiff questioned how Atkinson could come to that conclusion, he echoed Langan's comments that the accounts somehow lacked "quality." Plaintiff believes that Caucasian male account executives did not have to withstand this type of scrutiny regarding their accounts.

17. Taken together with her own experiences with racism at TTN, Plaintiff began to believe that there was a general hostility toward minorities in her office. This belief was based on a series of events during Plaintiff's employment with TTN.

18. For example, while on a business trip in December 2006 with Chicago Account Executives and the Chicago Office Manager, Plaintiff was given a bag of pork rinds by Gerry Himmel (male, non-African-American Account Executive). When Plaintiff asked why he got her pork rinds instead of the chocolate M&Ms that she asked for, the Account Executive responded "isn't this what you people eat?" Although it was evident that Plaintiff was deeply offended by the comment, neither Himmel nor Langan, the Chicago Office Manager, said a word about it. Weeks later, Langan asked Plaintiff if the comment bothered her and when Plaintiff replied "yes," he told her he would let Human Resources know about the incident.

19. In another example, on December 21, 2006, Plaintiff was sitting in Langan's office discussing accounts. Himmel entered Langan's office and asked Plaintiff why "60% of African-American women in the City of Los Angeles between the age group of 25 and 34 are unmarried with four or more children?" Although offended, Plaintiff responded that she did not know and tried to ignore Himmel. Himmel then stated, in front of Langan, "what's up with that homie?"

20. In another example, on December 28, 2006, Himmel walked into the office and commented that Plaintiff had that "Samuel Jackson look going on." A few hours later he addressed Plaintiff with "Yo!" – stating that he knew she didn't like being addressed that way and then proceeding to ask her about the location of office supplies.

21. In yet another example, on January 5, 2007, Langan held an office sales meeting. At the meeting, Himmel addressed Harder and Plaintiff and gave a mock sales presentation in a derogatory manner by mocking the Spanish language. He then made derogatory and sarcastic remarks about Hispanics and African-Americans.

22. Plaintiff also learned that racial hostility was not limited to her own office. For example, on December 20, 2006, Langan had told Plaintiff that TTN had prior problems with

racial discrimination.  Further, Plaintiff came to understand that the Milwaukee office manager refused to go on sales calls in African-American neighborhoods, and that he sent only African-American account executives on these calls.

23. While Plaintiff was forced to endure racial discrimination, she was also subject to poor treatment on account of her gender.  During February of 2007, Langan commented to Plaintiff, "you better close some business, Missy, and soon!"  This was not the first time that Langan called Plaintiff "Missy."

24. In another incident, Langan had told Plaintiff that she could "ask some pretty dumb questions."  This was compounded by a previous incident where Langan told Plaintiff that the Director of Network Sales, James Atkinson (male, non-African-American) spoke with Langan and referred to Plaintiff as an "airhead."  Upon information and belief, this was one of several times in which Atkinson called women "airheads" and specifically referred to Plaintiff in a derogatory manner.

25. Plaintiff often witnessed men demeaning other women in her office.  In fact, the first computer issued to Plaintiff at the office when she was hired had a letter from a departing female employee on it complaining of a "sexist environment" or words to that affect.  The departing employee said she was leaving because "she couldn't take it anymore" or words to that affect.

26. Plaintiff did not initially complain to Human Resources because of a comment that Langan had made to her.  Specifically, Langan told Plaintiff that Shaffer thought Plaintiff was "dumb" after Plaintiff had spoken to her in October 2006 about a pay issue.  Langan also told Plaintiff that she should try not to contact Shaffer for anything because it wouldn't be "good for her."  However, on January 8, 2007, Langan and Shaffer spoke with Plaintiff about the "pork rind" incident that occurred in December 2006.

27. On January 11, 2007, Shaffer continued her conversation with Plaintiff, where Plaintiff conveyed to Shaffer the many incidents of discrimination that she had encountered at TTN. During that conversation, Plaintiff told Shaffer, among other things, that that she was suffering from discrimination based on her race and gender and that her work environment had become very hostile. She also informed Shaffer that the discrimination that she was suffering was negatively affecting her ability to perform her job, and that she wanted full investigation into the specific incidents that she was reporting and the discrimination that she was experiencing. Lastly, she informed Shaffer that, in her opinion, the "pork rind" incident should have been dealt with by Langan when it happened, rather than weeks later.

28. Although Shaffer told Plaintiff that the company "embraced diversity" and would investigate and remedy Plaintiff's issues, she also asked Plaintiff not to file a lawsuit.

29. This would not be the first time that Plaintiff would be told not to pursue a lawsuit by TTN. On January 12, 2007, Langan asked Plaintiff not to file a lawsuit. In that conversation, Langan told Plaintiff that if she filed a lawsuit, the company stood a chance of losing a lot of money and that he would "go down for it too" or words to that affect. Langan asked Plaintiff to "think about [him] because [he] has two kids and it would be hard to find a job" or words to that affect.

30. Going forward, Plaintiff felt uncomfortable with the pressure Langan had put on her. For all intents and purposes, Plaintiff felt like she did not have a manager anymore but rather, an interested party with a guilty conscious. For the next few weeks, Langan continued to ask what Plaintiff was going to do about "the situation." To the best of Plaintiff's knowledge, an investigation was not done into her many detailed complaints.

**TTN Retaliates Against Plaintiff For Filing Her Initial EEOC Charge**

31. Rather than investigate Plaintiff's complaints and assist her in getting her career back on track, TTN began a destructive campaign of retaliation against Plaintiff.

32. For example, during the week of February 5, 2007, Langan began to have several meetings with Plaintiff about her accounts and leads. Langan criticized Plaintiff's accounts and the status of her leads and told her, "They are going to be on me" or words to that affect. Although he had never indicated this before Plaintiff had conveyed her complaints of discrimination, Langan was now commenting that Plaintiff was prospecting in the wrong geographical areas and not prospecting enough generally. Prior to filing her Charge of Discrimination and informing TTN of her complaints regarding discrimination, the company had provided Plaintiff with largely positive feedback.

33. Also in February 2007, Langan told Complainant that he would be watching her more closely because "that was what the corporate office wanted." It was at this time that Plaintiff believed that Human Resources was looking to "document her" into an eventual exit from the company.

34. On May 2, 2007, Plaintiff's belief that TTN was trying to "document her" was confirmed by Langan. Langan informed Plaintiff that he had written her a favorable performance evaluation, however, he was told by Shaffer to re-write the evaluation in an unfavorable manner. Langan also explained to Plaintiff that he was instructed by Shaffer not to give Plaintiff the evaluation until after the First Quarterly Meeting in Orlando, Florida during the first week of April 2007. Langan explained that Shaffer was to present a "Discrimination in the Workplace" program at the meeting and that by that time, two new African American sales representatives were expected to be hired. Langan had all but said that he was told to hold the negative evaluation until TTN could be in a better position to rebut any claims of discriminatory

8

conduct and/or retaliation.

35. In addition, upon information and belief, some, if not all, of Plaintiff's colleagues were informed of Plaintiff's complaints and thereafter ostracized and belittled her. For example, a male Account Executive had an exchange with Langan in front of Plaintiff in which Langan asked if he said anything that may be deemed inappropriate to which the male Account Executive responded, "no, you didn't say anything about her sex or race – you're good" or words to that affect.

**TTN Continues to Retaliate Against Plaintiff For Filing Her Amended EEOC Charge**

36. In April 2007, Plaintiff hired the undersigned attorneys and filed an Amended Charge of Discrimination with the EEOC regarding new and more obstreperous treatment in her workplace on April 23, 2007. Within days of that filing, on or about April 25, 2007, management required Plaintiff to submit to a self-evaluation of her performance. This "self-evaluation" was neither protocol nor previously required for any employees, including Claimant. Further, on information and belief, no other employees were ever subjected to such measures in evaluating performance. Plaintiff alleges that this self-evaluation was simply another of TTN's methods to amass documentation on Plaintiff in order to more easily terminate her employment under the guise of a legitimate business decision.

37. Further, when Plaintiff informed management that she believed that the activity was discriminatory and only served to document her in an effort to eventually terminate her, management, while attempting to refute her claims, threatened her job security by claiming that if she did not perform the evaluation, TTN would consider it "willful insubordination." Thus, not only was Plaintiff subject to what she alleges was a discriminatory and retaliatory activity, but if she refused to participate, she would be fired anyway.

9

38. Despite TTN's efforts to drive her out of the company, Plaintiff was continuing to make strong in-roads into the communities she was canvassing. Indeed, on or about May 2, 2007, Plaintiff was in the late stages of obtaining a contract with a client that would have been a large account for her and her office.

39. The account was for Pinkston Child Care Academy, an African-American-owned company based out of Chicago that operates and manages childcare centers throughout the city. When Plaintiff inquired as to whether the contract was ready for release, management informed her that they would not release the contract because of the client's "significant credit problems." Additionally, when Plaintiff asked whether Harder had been apprised as to the Pinkston account, he responded, "Yeah, his credit is real shitty."

40. In Plaintiff's experience, no other account executive was required to run a credit check on their potential accounts. Moreover, Plaintiff could not recall any instance in which other potential clients were required to submit to a credit check before their business would be accepted. Quite to the contrary, Plaintiff knew that the office was starving for new accounts and each and every lead, let alone an account received, was a major event.

41. This action was discriminatory, not only with regard to Plaintiff, but also with regard to the African-American client who was required to submit to additional measures prior to engaging TTN's services. Further, Plaintiff never observed her manager refer to or speak about any of her non-African-American counterparts' accounts in such a cavalier or disrespectful manner. This type of treatment was clearly an effort by management to reduce the importance of Plaintiff's hard work and only heightened Plaintiff's awareness of the racial hostility rampant in the office.

42. Further, to her knowledge, Plaintiff does not believe that the aforementioned client

ever filled out a credit application for her or at Defendant's request, as it was not protocol to require the client to do so.  When she inquired as to how the client's credit was examined, management told Plaintiff that it had used Experian to run the credit check, which is used primarily for individuals and consumers, but not with Dunn and Bradstreet, which is more commonly used to run the credit of businesses.  Further, Plaintiff understands that Pinkston Child Care Academy's credit is very good.  Nonetheless, as a result of TTN's treatment of the client, Pinkston Child Care Academy itself inquired with Plaintiff as to whether or not it could sue TTN for discriminatory business practices.

      43. TTN also resorted to outright intimidation in its attempts to force Plaintiff out of the company.  On or about May 7, 2007, Plaintiff's manager called her into his office and told her that he wanted to talk to her about moving accounts away from and between executives. Plaintiff informed her manager that she thought a series of steps should be taken before taking an account away from an Account Executive.  She further stated that if the Account Executive was doing a good job, she wondered why her manager would consider taking the account away from that Account Executive.  Her manager then gave Plaintiff the following example:  "[Another Account Executive] has done a good job with Harper (a TTN client) and she could possibly do the same with Triton (Plaintiff's client)."  This tactic was clearly an effort by management to intimidate Plaintiff and to demonstrate yet another way in which it would act to eradicate her business from the company, allowing management to terminate her for what would appear to be a purely business purpose.

      44. Finally, in or about June 2007, Respondent's Chicago and Milwaukee offices closed.  The closures occurred while charges of discrimination were pending against management in the Chicago office.  Further, upon information and belief, the African-American and female

employees at the Milwaukee offices were subject to similar discriminatory treatment and may have logged complaints with TTN and/or filed Charges of Discrimination with the EEOC.[1]

45. Plaintiff alleges that these closures were retaliatory in nature.  Although unusual, Plaintiff strongly believes that this fledgling company would rather shut offices down and take away the livelihood of its employees, including Plaintiff and other individuals engaging in protected activities, rather than effectively deal with the rampant gender and racial discrimination that is ingrained in the company culture.  Indeed, TTN is still operating in the regional area and continues to work with Chicago-based clients, including those formerly working with Plaintiff.

46. In sum, TTN's discriminatory and retaliatory actions taken against Plaintiff, including disparaging her, "documenting her," issuing her inferior performance reviews, and ostracizing her were intended to interfere with her long-term career at TTN, damage her reputation with the company, and make her vulnerable for termination.  When Plaintiff could not be forced out she was ultimately terminated off under the guise of an office closure.

## COUNT I

**GENDER AND RACE DISCRIMINATION IN VIOLATION OF TITLE VII**

47.  Plaintiff realleges paragraphs 1 through 47 and incorporates them by reference as paragraphs 1 through 47 of Count I of this Complaint.

48.  Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq*., as amended by the Civil Rights Act of 1991 make it unlawful to discriminate against any individual by denying the individual employment opportunities with respect to the terms, conditions, or

---

[1] On or about May 18, 2007, one of Claimant's former managers, who had worked for 8 months previous at the Milwaukee offices, informed her that the Milwaukee office manager refused to go on sales calls in African-American neighborhoods, and that he sent only African-American account executives on these calls.  This manager's comment was unsolicited and voluntary.

privileges of employment on the basis of gender or race.

49. By its conduct alleged herein, TTN engaged in unlawful employment practices under Title VII.

50. TTN has allowed the unlawful conduct alleged herein to exist and to go unremedied for so long that it amounts to a policy or practice and constitutes TTN's standard operating procedure.

51. As a direct and proximate result of TTN's unlawful conduct, Plaintiff suffered damages.

## COUNT II

### VIOLATION OF THE EQUAL PAY ACT

52. Plaintiff realleges paragraphs 1 through 51 and incorporates them by reference as paragraphs 1 through 51 of Count II of this Complaint.

53. The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. Section 206 and 207, makes it unlawful for an employer on the basis of sex to pay lower wages or fringe benefits to employees of one sex than it does to similarly situated employees of the other sex.

54. By its conduct alleged herein, TTN willfully and knowingly engaged in unlawful employment practices under the Equal Pay Act.

55. As a direct and proximate result of TTN unlawful conduct, Plaintiff suffered damages.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981

56. Plaintiff realleges paragraphs 1 to 55 and incorporates them by reference as paragraphs 1 to 55 of Count III of this Complaint.

57. Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

58. TTN engaged in race discrimination against Plaintiff, an African-American, that constitutes illegal intentional race discrimination in violation of 42 U.S.C. Section 1981.

59. Plaintiff was subjected to and harmed by TTN's discrimination.

60. TTN's unlawful conduct resulted in considerable harm to Plaintiff.

## COUNT IV

### RETALIATION IN VIOLATION OF TITLE VII AND THE EQUAL PAY ACT

61. Plaintiff realleges paragraphs 1 to 60 and incorporates them by reference as paragraphs 1 to 60 of Count IV of this Complaint.

62. Title VII, specifically 42 U.S.C. 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination. The Equal Pay Act provisions of the Fair Labor Standards Act also forbids employers from engaging in retaliatory conduct.

63. Plaintiff complained of sexual and racial discrimination.

64. By its conduct alleged here, TTN unlawfully retaliated against Plaintiff for her complaints in violation of the anti-retaliation provisions of Title VII.

65. The unlawful employment practices alleged herein were intentional and were performed by TTN with malice or reckless indifference to TTN's obligations under Title VII.

66. As a direct and proximate result of TTN's conduct, Plaintiff suffered damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court find in her favor and against Defendant as follows:

    a.    Enter an appropriate injunction compelling TTN to cease and desist from the wrongful practices herein alleged and hereafter established;

    b.    Declare that the acts and conduct of TTN violates the anti-retaliation provisions of Title VII and the Equal Pay Act provisions of the Fair Labor Standards Act

    c.    Award Plaintiff the value of all compensation and benefits lost as a result of Defendant's unlawful conduct;

    d.    Award Plaintiff the present value of all compensation and benefits she will lose in the future as a result of Defendant's unlawful conduct;

    e.    Award Plaintiff compensatory damages;

    f.    Award Plaintiff punitive damages;

    g.    Award Plaintiff liquidated damages;

    h.    Award Plaintiff prejudgment interest;

    i.    Award Plaintiff reasonable attorneys' fees, costs and disbursements;

    j.    Award Plaintiff such other relief as this Court deems just and proper.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By: **/s/ Ethan G. Zelizer**
_____

Linda D. Friedman
Ethan G. Zelizer
**STOWELL & FRIEDMAN, LTD**.
321 S. Plymouth Court
Suite 1400
Chicago, Illinois 60604
(312) 431-0888