**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TERRY CARTER, JENNIFER** | ) | |
| **KRUEGER, AND LISBETT** | ) | |
| **RODRIGUEZ** | ) | **Case No.  07 C 6608** |
| | ) | |
| **Plaintiffs,** | ) | **Judge Leinenweber** |
| | ) | |
| **v.** | ) | **Magistrate Judge Nolan** |
| | ) | |
| **TRANSIT TELEVISION NETWORK,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

**AMENDED COMPLAINT**

Plaintiffs, Terry Carter, Jennifer Krueger, and Lisbett Rodriguez, by and through their

attorneys, Stowell & Friedman, Ltd., for their Complaint against Transit Television Network

(hereinafter "Defendant" or "TTN") state as follows:

**JURISDICTION**

1.   Jurisdiction is based on 28 U.S.C. §§1331 and 1343, as well as Title VII of the Civil

Rights Act of 1964 (as amended) ("Title VII"), Section 1977 of the Revised Statutes, 42 U.S.C.

Section 1981, as amended ("Section 1981"), and the Equal Pay Act provisions of the Fair Labor

Standards Act ("the Equal Pay Act").

**PARTIES**

2.   Plaintiff Terry Carter ("Carter") an African American woman is a former employee of

Defendant TTN, formerly located in Chicago, Illinois.  Carter resides in this judicial district and

was employed by TTN in this district.   Carter has exhausted her administrative remedies with

the Equal Employment Opportunity Commission ("EEOC") and has received a Right to Sue

TTN in federal court.

3.   Plaintiff Jennifer Krueger ("Krueger"), a Caucasian woman, is a former employee of Defendant TTN, formerly located in Chicago, Illinois.  Krueger resides in this judicial district and was employed by TTN in this district.

4.   Plaintiff Lisbett Rodriguez ("Rodriguez"), an Hispanic woman, is a former employee of Defendant TTN, formerly located in Chicago, Illinois.  Rodriguez resides in this judicial district and was employed by TTN in this district.

5.   TTN, headquartered in Orlando, Florida, is the largest out-of-home digital network providing information, entertainment and advertising to transit riders across North America.  TTN is the largest out-of-home network of its kind and one of the largest in the world.  TTN's website states that it is currently doing business in Atlanta, Chicago, Los Angeles, Orlando, Milwaukee and San Diego and is continuing to expand into additional North American markets.

6.   TTN's Human Resources Department is run remotely from Orlando, Florida and headed by Norma Shaffer ("Schaffer"), a Caucasian woman.

7.   Upon information and belief, TTN closed its offices in Milwaukee, WI and Chicago, IL in the Summer of 2007.

## FACTUAL ALLEGATIONS

*Terry Carter*

8.   From approximately September 8, 2006 until the Chicago TTN office closed in the summer of 2007, Plaintiff Carter worked as an Account Executive.  During this time, Carter reported directly to Office Manager Matt Langan ("Langan"), a Caucasian man, and later, to James Harder ("Harder"), who is also a Caucasian man.

9.   Throughout her employment, Carter discharged all duties assigned to her competently.  Carter did not receive performance reviews until after she complained of

2

discrimination and, accordingly, those reviews were riddled with discriminatory animus towards her. However, prior to that point, Langan told Carter that she was meeting or exceeding TTN's expectations.

10. Notwithstanding her job performance, Carter was subjected to sex discrimination, racial discrimination, discrimination in pay, and retaliation during her employment with TTN. Carter experienced a culture at TTN where managers and employees alike maintain stereotypical views about African Americans and women that create a work environment where occupational segregation, disparate treatment, harassment, and retaliation are condoned.

11. Complicit in TTN's unlawful conduct is its Human Resources Department, run by Schaffer, which is ineffective at resolving complaints of discrimination, and is even frequently involved in acts of discrimination and retaliation.

12. In December 2006 and January 2007, Carter formally complained of discrimination within TTN through the proper channels. On February 7, 2007, Carter formally filed her Charge of Discrimination with the EEOC. After complaining within TTN and filing her Charge of Discrimination, Complainant suffered harassment and increased scrutiny of her job performance in retaliation for lodging her formal complaints.

**Carter Was A Victim Of TTN's Unlawful Discrimination And Retaliation**

13. Although Carter was hired with the understanding that she lived in the Chicago South suburbs and would canvas that area as well as Greater Chicago for potential clients that would advertise with TTN, Carter came to learn that TTN was not interested in minority clients.

14. Indeed, Carter lived in Olympia Fields, Illinois and knew that there were many great businesses in Chicago suburbs like Flossmoor, Orland Park, Frankfort, Matteson, Hazel Crest, Country Club Hills and Mokena that would respond favorably to the type of advertising TTN

and Carter had to offer.

15. This was not a novel approach, and Carter knew of other successful Account Executives throughout the country that targeted certain geographic regions in order to become the "go-to" person in that area for TTN's unique services.

16. Nonetheless, Carter was often questioned by Langan about why she was spending her time in the South suburbs.  In referring to business meetings and appointments she had taken with South Suburban businesses, Langan would often question the "quality" of the potential accounts.

17. Carter was not aware of instances in which Langan questioned the "quality" of an account other than when he criticized her pitches to minority–owned companies, or companies in areas known to have greater minority populations.  Carter often heard Langan and other Account Executives talk about bringing "the accounts in the door" because TTN was a fledgling company that needed to increase its numbers in the region.  However, it was only when Carter spoke about her business plan, meetings and appointments with minority–owned companies or companies in areas known to have greater minority populations that the issue of "quality" came into question.

18. Further, sometime during the latter part of 2006, James Atkinson ("Atkinson"), a Caucasian male who was the then-Director of Network Sales, commented that Carter was "wasting time and resources" by trying to prospect furrier clients to advertise with TTN because the audience was primarily Hispanic and African-American, and that they could not afford the merchandise, or words to that affect.  When Carter questioned how Atkinson could come to that conclusion, he echoed Langan's comments that the accounts somehow lacked "quality."  Carter believes that Caucasian male account executives did not have to withstand this type of scrutiny regarding their accounts.

19. Taken together with her own experiences with racism at TTN, Carter began to believe that there was a general hostility toward minorities in her office. This belief was based on a series of events during Carter's employment with TTN.

20. For example, while on a business trip in December 2006 with Chicago Account Executives and the Chicago Office Manager, Carter was given a bag of pork rinds by Gerry Himmel ("Himmel") a male, non-African-American Account Executive. When Carter asked why he got her pork rinds instead of the chocolate M&Ms that she asked for, the Account Executive responded "isn't this what you people eat?" Although it was evident that Carter was deeply offended by the comment, neither Himmel nor Langan, the Chicago Office Manager, said a word about it. Weeks later, Langan asked Carter if the comment bothered her. When she indicated that it did, he told her he would let Human Resources know about the incident.

21. In another example, on or about December 21, 2006, Carter was sitting in Langan's office discussing accounts. Himmel entered Langan's office and asked Carter why "60% of African-American women in the City of Los Angeles between the age group of 25 and 34 are unmarried with four or more children?" Although offended, Carter responded that she did not know and tried to ignore Himmel. Himmel then stated, in front of Langan, "What's up with that homie?"

22. In another example, on December 28, 2006, Himmel walked into the office and commented that Carter had that "Samuel Jackson look going on." A few hours later he addressed Carter with "Yo!" – stating that he knew she didn't like being addressed that way and then proceeding to ask her about the location of office supplies.

23. In yet another example, on January 5, 2007, Langan held an office sales meeting. At the meeting, Himmel addressed Harder and Carter and gave a mock sales presentation in a

5

derogatory manner by mocking the Spanish language.  He then made derogatory and sarcastic remarks about Hispanics and African-Americans.

24.  Carter also learned that racial hostility was not limited to her own office.  For example, on December 20, 2006, Langan had told Carter that TTN had prior problems with racial discrimination.   Further, Carter came to understand that the Milwaukee office manager refused to go on sales calls in African-American neighborhoods, and that he sent only African-American Account Executives on these calls.

25. While Carter was forced to endure racial discrimination, she was also subject to poor treatment on account of her gender.  During February of 2007, Langan commented to Carter, "you better close some business, Missy, and soon!"  This was not the first time that Langan called Carter "Missy."

26. In another incident, Langan had told Carter that she could "ask some pretty dumb questions."  This was compounded by a previous incident where Langan told Carter that Atkinson spoke with Langan and referred to Carter as an "airhead."  Upon information and belief, this was one of several times in which Atkinson called women "airheads" and specifically referred to Carter in a derogatory manner.

27. Carter often witnessed men demeaning other women in her office.  In fact, the first computer issued to Carter at the office when she was hired had a letter from a departing female employee on it complaining of a "sexist environment" or words to that affect.  The departing employee said she was leaving because "she couldn't take it anymore" or words to that affect.

28. Carter did not initially complain to Human Resources because of a comment that Langan had made to her.  Specifically, Langan told Carter that Shaffer thought Carter was "dumb" after Carter had spoken to her in October 2006 about a pay issue.  Langan also told

Carter that she should try not to contact Shaffer for anything because it wouldn't be "good for her." However, on January 8, 2007, Langan and Shaffer spoke with Carter about the "pork rind" incident that occurred in December 2006.

29. On or about January 11, 2007, Shaffer continued her conversation with Carter, where Carter conveyed to Shaffer the many incidents of discrimination that she had encountered at TTN. During that conversation, Carter told Shaffer, among other things, that she was suffering from discrimination based on her race and gender and that her work environment had become very hostile. She also informed Shaffer that the discrimination that she was suffering was negatively affecting her ability to perform her job, and that she wanted a full investigation into the specific incidents that she was reporting and the discrimination that she was experiencing. Lastly, she informed Shaffer that, in her opinion, the "pork rind" incident should have been dealt with by Langan when it happened, rather than weeks later.

30. Although Shaffer told Carter that the company "embraced diversity" and would investigate and remedy Carter's issues, she also asked Carter not to file a lawsuit.

31. This would not be the first time that Carter would be told not to pursue a lawsuit by TTN. On or about January 12, 2007, Langan asked Carter not to file a lawsuit. In that conversation, Langan told Carter that if she filed a lawsuit, the company stood a chance of losing a lot of money and that he would "go down for it too" or words to that affect. Langan asked Carter to "think about [him] because [he] has two kids and it would be hard to find a job" or words to that affect.

32. Going forward, Carter felt uncomfortable with the pressure Langan had put on her. For all intents and purposes, Carter felt like she did not have a manager anymore but rather, an interested party with a guilty conscious. For the next few weeks, Langan continued to ask what

Carter was going to do about "the situation." To the best of Carter's knowledge, an investigation was not done into her many detailed complaints.

**TTN Retaliates Against Carter For Filing Her Initial EEOC Charge**

33. Rather than investigate Carter's complaints and assist her in getting her career back on track, TTN began a destructive campaign of retaliation against Carter.

34. For example, during the week of February 5, 2007, Langan began to have several meetings with Carter about her accounts and leads. Langan criticized Carter's accounts and the status of her leads and told her, "They are going to be on me" or words to that affect. Although he had never indicated this before Carter had conveyed her complaints of discrimination, Langan was now commenting that Carter was prospecting in the wrong geographical areas and not prospecting enough generally. Prior to filing her Charge of Discrimination and informing TTN of her complaints regarding discrimination, the company had provided Carter with largely positive feedback.

35. Also in February 2007, Langan told Carter that he would be watching her more closely because "that was what the corporate office wanted." It was at this time that Carter believed that Human Resources was looking to "document her" into an eventual exit from the company.

36. On or about May 2, 2007, Carter's belief that TTN was trying to "document her" was confirmed by Langan. Langan informed Carter that he had written her a favorable performance evaluation, however, Shaffer told him to re-write the evaluation in an unfavorable manner. Langan also explained to Carter that he was instructed by Shaffer not to give Carter the evaluation until after the First Quarterly Meeting in Orlando, Florida during the first week of April 2007. Langan explained that Shaffer was to present a "Discrimination in the Workplace"

program at the meeting and that by that time, two new African American sales representatives were expected to be hired.  Langan had all but said that he was told to hold the negative evaluation until TTN could be in a better position to rebut any claims of discriminatory conduct and/or retaliation.

37. In addition, upon information and belief, some, if not all, of Carter's colleagues were informed of Carter's complaints and thereafter ostracized and belittled her.  For example, a male Account Executive had an exchange with Langan in front of Carter in which Langan asked if he said anything that may be deemed inappropriate to which the male Account Executive responded, "no, you didn't say anything about her sex or race – you're good" or words to that affect.

**TTN Continues to Retaliate Against Carter For Filing Her Amended EEOC Charge**

38. In April 2007, Carter hired the undersigned attorneys and filed an Amended Charge of Discrimination with the EEOC regarding new and more obstreperous treatment in her workplace on April 23, 2007.  Within days of that filing, on or about April 25, 2007, management required Carter to submit to a self-evaluation of her performance.  This "self-evaluation" was neither protocol nor previously required for any employees, including Claimant.  Further, on information and belief, no other employees were ever subjected to such measures in evaluating performance.  Carter alleges that this self-evaluation was simply another of TTN's methods to amass documentation on her in order to more easily terminate her employment under the guise of a legitimate business decision.

39. Further, when Carter informed management that she believed that the activity was discriminatory and only served to document her in an effort to eventually terminate her, management, while attempting to refute her claims, threatened her job security by claiming that

if she did not perform the evaluation, TTN would consider it "willful insubordination." Thus, not only was Carter subject to what she alleges was a discriminatory and retaliatory activity, but if she refused to participate, she would be fired anyway.

40. Despite TTN's efforts to drive her out of the company, Carter was continuing to make strong in-roads into the communities she was canvassing. Indeed, on or about May 2, 2007, Carter was in the late stages of obtaining a contract with a client that would have been a large account for her and her office.

41. The account was for Pinkston Child Care Academy, an African-American-owned company based out of Chicago that operates and manages childcare centers throughout the city. When Carter inquired as to whether the contract was ready for release, management informed her that they would not release the contract because of the client's "significant credit problems." Additionally, when Carter asked Harder whether he had been apprised as to the Pinkston account, he responded, "Yeah, his credit is real shitty."

42. In Carter's experience, no other Account Executive was required to run a credit check on their potential accounts. Moreover, Carter could not recall any instance in which other potential clients were required to submit to a credit check before their business would be accepted. Quite to the contrary, Carter knew that the office was starving for new accounts and each and every lead, let alone an account received, was a major event.

43. This action was discriminatory, not only with regard to Carter, but also with regard to the African-American client who was required to submit to additional measures prior to engaging TTN's services. Further, Carter never observed her manager refer to or speak about any of her non-African-American counterparts' accounts in such a cavalier or disrespectful manner. This type of treatment was clearly an effort by management to reduce the importance of

Carter's hard work and only heightened Carter's awareness of the racial hostility that was rampant in the office.

44. Further, to her knowledge, Carter does not believe that the aforementioned client ever filled out a credit application for her or at Defendant's request, as it was not protocol to require the client to do so.  When she inquired as to how the client's credit was examined, management told Carter that it had used Experian to run the credit check, which is used primarily for individuals and consumers, but not with Dunn and Bradstreet, which is more commonly used to run the credit of businesses.  Further, Carter understands that Pinkston Child Care Academy's credit is very good.  Nonetheless, as a result of TTN's treatment of the client, Pinkston Child Care Academy itself inquired with Carter as to whether or not it could sue TTN for discriminatory business practices.

45. TTN also resorted to outright intimidation in its attempts to force Carter out of the company.  On or about May 7, 2007, Carter's manager called her into his office and told her that he wanted to talk to her about moving accounts away from and between executives. Carter informed her manager that she thought a series of steps should be taken before taking an account away from an Account Executive.  She further stated that if the Account Executive was doing a good job, she wondered why her manager would consider taking the account away from that Account Executive.  Her manager then gave Carter the following example:  "[Another Account Executive] has done a good job with Harper (a TTN client) and she could possibly do the same with Triton (Carter's client)."  This tactic was clearly an effort by management to intimidate Carter and to demonstrate yet another way in which it would act to eradicate her business from the company, allowing management to terminate her for what would appear to be a purely business purpose.

11

46. Finally, in or about June 2007, Respondent's Chicago and Milwaukee offices closed. The closures occurred while charges of discrimination were pending against management in the Chicago office. Further, upon information and belief, the African-American and female employees at the Milwaukee offices were subject to similar discriminatory treatment and may have logged complaints with TTN and/or filed Charges of Discrimination with the EEOC.[1]

47. Carter alleges that these closures were retaliatory in nature. Although unusual, Carter strongly believes that this fledgling company would rather shut offices down and take away the livelihood of its employees, including Carter and other individuals engaging in protected activities, rather than effectively deal with the rampant gender and racial discrimination that is ingrained in the company culture. Indeed, TTN is still operating in the regional area and continues to work with Chicago-based clients, including those formerly working with Carter.

48. In sum, TTN's discriminatory and retaliatory actions taken against Carter, including disparaging her, "documenting her," issuing her inferior performance reviews, and ostracizing her were intended to interfere with her long-term career at TTN, damage her reputation with the company, and make her vulnerable for termination. When Carter could not be forced out she was ultimately terminated off under the guise of an office closure.

**TTN Did Not Pay Carter Equally for Her Work**

49. During her tenure, Carter was not paid commensurate with her performance, but also, as compared to her similarly situated male counterparts. Carter was paid a lower salary than male employees in substantially equal jobs, including Langan, Harder, and Jerry Himmel, even though Carter performed similar duties requiring the same skill, effort, and responsibility of male

---

[1] On or about May 18, 2007, one of Carter's former managers, who had worked for 8 months previous at the Milwaukee offices, informed her that the Milwaukee office manager refused to go on sales calls in African-American neighborhoods, and that he sent only African-American Account Executives on these calls. This manager's comment was unsolicited and voluntary.

employees.  Moreover, Carter received less compensation in terms of commissions as compared to her male counterparts due to her sex.

50. The differential in pay between sexes was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.

51. TTN intentionally paid Carter less than it paid male employees who were performing substantially equal work.

**Timely Representative Charges of Sexual Discrimination Were Filed**
**Against Transit Television Network with the Equal Employment Opportunity Commission**

52. Carter has filed timely representative charges of racial and sexual discrimination, and of unlawful retaliation against TTN with the EEOC.  The EEOC has issued Notices of Rights to Sue on the representative charges.[2]

**Plaintiff Carter Suffered Extreme Emotional Distress**

53. By the acts and conduct described above, TTN intended to and did cause Carter severe emotional distress, or acted in reckless disregard such that its actions had caused and would cause Carter such injury.

54. The acts and conduct of TTN toward Carter constitutes extreme and outrageous conduct beyond the bounds of common decency.

**Plaintiff Carter Was Injured as a Consequence of Defendants' Unlawful Conduct**

55. Plaintiff Carter lost wages and other benefits, suffered embarrassment and humiliation, and her career was irreparably injured as a result of TTN's conduct.  Carter suffered loss of enjoyment of life, inconvenience and other non-pecuniary losses as a direct result of TTN's conduct.

56. The actions of TTN have caused and continue to cause Plaintiff Carter substantial

---

[2] Carter has requested a Right to Sue letter on her Charge of Unlawful Retaliation, which should be issued in the next few weeks.

losses in earnings, management opportunities and other employment benefits, in an amount to be determined by a jury.

57. TTN acted or failed to act as herein alleged with malice or reckless indifference to the protected civil rights of Plaintiff Carter. Plaintiff Carter is thus entitled to recover punitive damages in an amount to be determined by a jury.

### Jennifer Krueger

58. Jennifer Krueger ("Krueger") began her employment with TTN on October of 2004 as an account executive in the Chicago office. Plaintiff Krueger was hired at an annual salary of $40,000 plus commissions. Krueger executed her job responsibilities diligently and competently, and enjoyed a good reputation with her clients and coworkers. During her career, Krueger received excellent ratings on her performance reviews from her supervisors. Her superior abilities and high level of sales earned her the title of Top Sales Executive during 2005. In fact, the closest salesperson to her level of sales was at least $50,000 in sales behind her.

59. During her tenure, Krueger was not paid commensurate with her performance, but also, as compared to her similarly situated male counterparts. Krueger was paid a lower salary than male employees in substantially equal jobs, including Langan, even though Krueger performed similar duties requiring the same skill, effort, and responsibility of male employees. On information and belief, some of Krueger's male counterparts, including Langan, were making almost double her salary. Moreover, Krueger received less compensation in terms of commissions as compared to her male counterparts due to her sex.

60. The differential in pay between men and women was not pursuant to seniority, merit, quantity or quality of production, but was due to sex. TTN intentionally paid Krueger less than it paid male employees who were performing substantially equal work.

61. Evidence of TTN's intent to compensate women less than men for equal work can be found in comments made by then-Chief Executive Officer Gerry Noble who responded to Plaintiff Krueger's complaints of unequal pay by stating "you will never be able to get [men's wages] because there is a glass ceiling that you can't get over.  That is why I have to pay guys that are 35-40 top price" or words to that effect.

### Lizbett Rodriguez

62. Lizbett Rodriguez ("Rodriguez") began her employment with TTN on April 11, 2005. She was employed in the Chicago office as an Account Executive.  On information and belief, she was hired at the annual salary of $40,000 plus commission.  She executed her job responsibilities diligently and competently, and enjoyed a good reputation with her clients and coworkers.  She even won the title of Top Sales Executive during 2005 for her exquisite account management and service to the company. During her tenure, Rodriguez was not paid commensurate with her performance, but also, as compared to her similarly situated male counterparts.  Rodriguez was paid a lower salary than male employees in substantially equal jobs, including Langan, despite her performance of similar duties requiring the same skill, effort, and responsibility of male employees.  On information and belief, Rodriguez was paid almost half the salary of her similarly situated male colleagues.  Moreover, Rodriguez received less compensation in terms of commissions as compared to her male counterparts due to her sex.

63. The differential in pay between sexes was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.

64. TTN intentionally paid Rodriguez less male employees who performed substantially equal work.

65. Evidence of TTN's intent to compensate women less than men for equal work can

be found in comments made by then-Chief Executive Officer Gerry Noble who responded to

Plaintiff Rodriguez's complaints of unequal pay by stating "well [equal pay] isn't going to

happen … take it or leave it" or words to that effect.

**TTN was Aware of the Conduct of its Employees and Failed to Prevent Racial and Sexual**
**Discrimination and Retaliation**

66. TTN's management directed, encouraged and participated in the above-described

unlawful conduct.  Further, TTN allowed the discrimination and retaliation to go unremedied for

so long that it amounts to a policy or practice and constitutes TTN's standard operating

procedure.  Finally, TTN's Human Resources Department failed to take appropriate remedial

action and, in effect, aided and abetted in the unlawful conduct.

## COUNT I

### (INDIVIDUAL CLAIM OF CARTER)
### GENDER AND RACE DISCRIMINATION IN VIOLATION OF TITLE VII

67. Plaintiff Carter realleges paragraphs 1 through 66 and incorporates them by reference

as paragraphs 1 through 66 of Count I of this Complaint.

68. Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.*, as

amended by the Civil Rights Act of 1991 makes it unlawful to discriminate against any

individual by denying the individual employment opportunities with respect to the terms,

conditions, or privileges of employment on the basis of gender or race.

69. By its conduct alleged herein, TTN engaged in unlawful employment practices under

Title VII.

70. TTN has allowed the unlawful conduct alleged herein to exist and to go unremedied

for so long that it amounts to a policy or practice and constitutes TTN's standard operating

procedure.

16

71. As a direct and proximate result of TTN's unlawful actions, Plaintiff Carter has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life.

## COUNT II

### (INDIVIDUAL CLAIM OF CARTER)
### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981

72. Plaintiff Carter realleges paragraphs 1 to 71 and incorporates them by reference as paragraphs 1 to 71 of Count II of this Complaint.

73. Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The terms "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

74. TTN engaged in race discrimination against Plaintiff Carter, an African-American, which constitutes illegal intentional race discrimination in violation of 42 U.S.C. Section 1981.

75. Carter was subjected to and harmed by TTN's discrimination.

76. As a direct and proximate result of TTN's unlawful actions, Plaintiff Carter has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliations and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life.

## COUNT III

### (INDIVIDUAL CLAIM OF CARTER)
### RETALIATION IN VIOLATION OF TITLE VII AND THE EQUAL PAY ACT

77. Plaintiff Carter realleges paragraphs 1 to 76 and incorporates them by reference as paragraphs 1 to 76 of Count III of this Complaint.

78. Title VII, specifically 42 U.S.C. 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

79. Plaintiff Carter complained of sexual and racial discrimination.

80. By its conduct alleged here, TTN unlawfully retaliated against Plaintiff Carter for her complaints in violation of the anti-retaliation provisions of Title VII.

81. The unlawful employment practices alleged herein were intentional and were performed by TTN with malice or reckless indifference to TTN's obligations under Title VII.

82. As a direct and proximate result of TTN's unlawful actions, Plaintiff Carter has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life.

## COUNT IV

### VIOLATION OF THE EQUAL PAY ACT

83. Plaintiffs reallege paragraphs 1 through 82 and incorporate them by reference as paragraphs 1 through 82 of Count IV of this Complaint.

84. The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. Section 206 and 207, makes it unlawful for an employer on the basis of sex to pay lower wages or fringe benefits to employees of one sex than it does to similarly situated employees of the other sex.

85. By its conduct alleged herein, TTN willfully and knowingly engaged in unlawful employment practices under the Equal Pay Act.

86. As a direct and proximate result of TTN unlawful conduct, Plaintiffs suffered damages.

## COUNT V

## RETALIATION IN VIOLATION THE EQUAL PAY ACT

87. Plaintiffs reallege paragraphs 1 to 86 and incorporate them by reference as paragraphs 1 to 86 of Count V of this Complaint.  The Equal Pay Act provisions of the Fair Labor Standards Act also forbids employers from engaging in retaliatory conduct.

88. Plaintiffs complained of discrimination in unequal pay.

89. By its conduct alleged here, TTN unlawfully retaliated against Plaintiffs for their complaints in violation of the anti-retaliation provisions of The Equal Pay Act.

90. The unlawful employment practices alleged herein were intentional and were performed by TTN with malice or reckless indifference to TTN's obligations under Title VII.

91. As a direct and proximate result of TTN's conduct, Plaintiffs suffered damages.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Court find in their favor and against Defendant as follows:

a.      Enter an appropriate injunction compelling TTN to cease and desist from the wrongful practices herein alleged and hereafter established;

b.      Declare that the acts and conduct of TTN violates the anti-retaliation provisions of Title VII and the Equal Pay Act provisions of the Fair Labor Standards Act;

c.      Award Plaintiffs the value of all compensation and benefits lost as a result of Defendant's unlawful conduct under the Equal Pay Act;

d.      Award Plaintiffs liquidated damages under the Equal Pay Act;

e.      Award Plaintiffs prejudgment interest;

f.      Award Plaintiffs reasonable attorneys' fees, costs and disbursements; and

g.      Award Plaintiffs such other relief as this Court deems just and proper.

### Individual Relief

h.      Plaintiff Carter incorporates by reference paragraphs (a) through (g) as paragraphs (a) through (g) of the prayer for relief for their individual claims, and in addition respectfully request that the court;

i.      Award the present value of all compensation and benefits she will lose in the future as a result of Defendant's unlawful conduct;

j.      Award compensatory damages;

k.      Award punitive damages;

l.      Award liquidated damages;

m.      Award prejudgment interest;

n.      Award reasonable attorneys' fees, costs and disbursements;

o.      Award such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil

Procedure.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By:     /s/ Ethan G. Zelizer

Linda D. Friedman
Ethan G. Zelizer
Jasmine E. Simmons
**STOWELL & FRIEDMAN, LTD**.
321 S. Plymouth Court
Suite 1400
Chicago, Illinois  60604
(312) 431-0888