**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

TERRY CARTER, JENNIFER KRUEGER
AND LISBETT RODRIGUEZ,

               Plaintiffs,

    v.

TRANSIT TELEVISION NETWORK,

               Defendant.

Case No.  07 C 6608

Judge Leinenweber
Magistrate Judge Nolan

**JURY TRIAL DEMANDED**

**DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO
PLAINTIFF'S AMENDED COMPLAINT**

**ANSWER TO AMENDED COMPLAINT**

Defendant, Transit Television Network[1] (hereinafter "Defendant" or "TTN"), by and through their attorneys Ford & Harrison LLP, for their Answer to Amended Complaint against Terry Carter, Jennifer, Krueger and Lisbett Rodriguez (hereinafter "Plaintiffs"), states as follows:

**JURISDICTION**

1.     Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343, as well as Title VII of the Civil Rights Act of 1964 (as amended) ("Title VII"), Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981, as amended ("Section 1981"), and the Equal Pay Act provisions of the Fair Labor Standard Act ("the Equal Pay Act").

    **ANSWER**:    Defendant admits that jurisdiction is proper in this Court, but denies that it acted unlawfully under any of the statutes referenced in Complaint Paragraph 1.

**PARTIES**

2.     Plaintiff Terry Carter ("Carter") an African American woman is a former employee of Defendant TTN, formerly located in Chicago, Illinois.  Carter resides in this judicial

---

[1] Plaintiff incorrectly omits Defendant's designation as a limited liability company.  Defendant's name is "Transit Television Network LLC."

district and was employed by TTN in this district. Carter has exhausted her administrative remedies with the Equal Employment Opportunity Commission ("EEOC") and has received a Right to Sue TTN in federal court.

**ANSWER**:     Defendant admits that Plaintiff Terry Carter is a former employee of Defendant, and that she was employed at Defendant's office in Chicago, Illinois. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 2, and therefore denies same.

3.     Plaintiff Jennifer Krueger ("Krueger"), a Caucasian woman, is a former employee of Defendant TTN, formerly located in Chicago, Illinois. Krueger resides in this judicial district and was employed by TTN in this District.

**ANSWER**:     Defendant admits that Plaintiff Jennifer Krueger is a former employee of Defendant, and that she was employed at Defendant's office in Chicago, Illinois. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 3, and therefore denies same.

4.     Plaintiff Lisbett [sic] Rodriguez ("Rodriguez"), an Hispanic woman, is a former employee of Defendant TTN, formerly located in Chicago, Illinois. Rodriguez resides in this judicial district and was employed by TTN in this district.

**ANSWER**:     Defendant admits that Plaintiff Lizbett Rodriguez is a former employee of Defendant, and that she was employed at Defendant's office in Chicago, Illinois. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 4, and therefore denies same.

5.     TTN, headquartered in Orlando, Florida, is the largest out-of-home digital network providing information, entertainment and advertising to transit riders across North America. TTN is the largest out-of-home network of its kind and one of the largest in the world. TTN's website states that it is currently doing business in Atlanta, Chicago, Los Angeles,

Chicago:353864.1

Orlando, Milwaukee and San Diego and is continuing to expand into additional North American markets.

**ANSWER**:    Defendant admits that its corporate headquarters is located in Orlando, Florida, and that its principle business is selling advertising by providing information and entertainment to operators of transit systems for consumption by users of the transit systems. Defendant admits that its current customer base includes customers in Atlanta, Georgia, Chicago, Illinois, Los Angeles, California, Orlando, Florida, and Milwaukee, Wisconsin, and that Defendant's website states an intention to continue expansion of its network.  On information and belief, Defendant admits that it is the largest and only provider of services of the type that it provides in the United States.

6.    TTN's Human Resources Department is run remotely from Orlando, Florida and headed by Norma Shaffer [sic] ("Schaffer") [sic], a Caucasian woman.

**ANSWER**:    Defendant admits that its Human Resources Department is located at its headquarters in Orlando, Florida; and that Norma Shafer is its Human Resources Director. Defendant admits that Norma Shafer is a Caucasian female.  Defendant denies any and all remaining allegations in Complaint Paragraph 6.

7.    Upon information and belief, TTN closed its offices in Milwaukee, WI and Chicago, IL in the Summer of 2007.

**ANSWER**:    Defendant admits the allegations in Complaint Paragraph 7.

## FACTUAL ALLEGATIONS

### *Terry Carter*

8.    From approximately September 8, 2006 until the Chicago TTN office closed in the Summer of 2007, Plaintiff Carter worked as an Account Executive.  During this time, Carter

reported directly to Office Manager Matt Langan ("Langan"), a Caucasian man, and later, to James Harder ("Harder"), who is also a Caucasian man.

**ANSWER**:    Defendant admits the allegations in Complaint Paragraph 8.


9.    Throughout her employment, Carter discharged all duties assigned to her competently.  Carter did not receive performance reviews until after she complained of discrimination and, accordingly, those reviews were riddled with discriminatory animus towards her.  However, prior to that point, Langan told Carter that she was meeting or exceeding TTN's expectations.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 9.


10.    Notwithstanding her job performance, Carter was subjected to sex discrimination, racial discrimination, discrimination in pay, and retaliation during her employment with TTN. Carter experienced a culture at TTN where managers and employees alike maintain stereotypical views about African Americans and women that create a work environment where occupational segregation, disparate treatment, harassment, and retaliation are condoned.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 10.


11.    Complicit in TTN's unlawful conduct is its Human Resources Department, run by Schaffer [sic], which is ineffective at resolving complaints of discrimination, and is even frequently involved in acts of discrimination and retaliation.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 11.


12.    In December 2006 and January 2007, Carter formally complained of discrimination within TTN through the proper channels.  On February 7, 2007, Carter formally filed her Charge of Discrimination with the EEOC.  After complaining within TTN and filing her Charge of Discrimination, Complainant suffered harassment and increased scrutiny of her job performance in retaliation for lodging her formal complaints.

**ANSWER**:    Defendant admits that Plaintiff Carter filed various Charges of Discrimination with the Equal Employment Opportunity Commission during 2007.  Defendant denies any and all remaining allegations in Complaint Paragraph 12.

Chicago:353864.1

**Carter was a victim of TTN's Unlawful Discrimination and Retaliation**

13.     Although Carter was hired with the understanding that she lived in the Chicago South suburbs and would canvas that area as well as Greater Chicago for potential clients that would advertise with TTN, Carter came to learn that TTN was not interested in minority clients.

**ANSWER**:     Defendant denies any and all allegations in Complaint Paragraph 13.

14.     Indeed, Carter lived in Olympia Fields, Illinois and knew that there were many great businesses in Chicago suburbs like Flossmoor, Orland Park, Frankfort, Matteson, Hazel Crest, Country Club Hills and Mokena that would respond favorably to the type of advertising TTN and Carter had to offer.

**ANSWER**:     On information and belief, Defendant admits that Plaintiff Carter lived in

Olympia Fields, Illinois while employed with Defendant.  Defendant lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Complaint

Paragraph 14, and therefore denies same.

15.     This was not a novel approach, and Carter knew of other successful Account Executives throughout the country that targeted certain geographic regions in order to become the "go-to" person in that area for TTN's unique services.

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth of the allegations in Complaint Paragraph 15, and therefore denies same.

16.     Nonetheless, Carter was often questioned by Langan about why she was spending her time in the South suburbs.  In referring to business meetings and appointments she had taken with South Suburban businesses, Langan would often question the "quality" of the potential accounts.

**ANSWER**:     Defendant admits that Langan discussed with Plaintiff Carter her focus on

certain geographic regions.  Defendant lacks knowledge or information sufficient to form a belief

as to whether Langan ever used the word "quality" during his discussions with Plaintiff Carter,

Chicago:353864.1

and therefore denies same.  Defendant denies any and all remaining allegations in Complaint

Paragraph 16.

17.    Carter was not aware of instances in which Langan questioned the "quality" of an account other than when he criticized her pitches to minority-owned companies, or companies in areas known to have greater minority populations.  Carter often heard Langan and other Account Executives talk about bringing "the accounts in the door" because TTN was a fledgling company that needed to increase its numbers in the region.  However, it was only when Carter spoke about her business plan, meetings and appointments with minority-owned companies or companies in areas known to have greater minority populations that the issue of "quality" came into question.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief

regarding what Plaintiff Carter was or was not aware of and what Plaintiff Carter did or did not

hear.  Defendant denies any and all remaining allegations in Complaint Paragraph 17.

18.    Further, sometime during the latter part of 2006, James Atkinson ("Atkinson"), a Caucasian male who was the then-Director of Network Sales, commented that Carter was "wasting time and resources" by trying to prospect furrier clients to advertise with TTN because the audience was primarily Hispanic and African-American, and that they could not afford the merchandise, or words to that affect.  When Carter questioned how Atkinson could come to that conclusion, he echoed Langan's comments that the accounts somehow lacked "quality."  Carter believes that Caucasian male account executives did not have to withstand this type of scrutiny regarding their accounts.

**ANSWER**:    Defendant admits that James Atkinson was Director of Network Sales in

2006, and that Atkinson is a Caucasian male.  Defendant lacks knowledge or information

sufficient to form a belief as to whether Atkinson ever used the word "quality" during his

discussions with Plaintiff Carter.  Defendant denies any and all remaining allegations in

Complaint Paragraph 18.

19.    Taken together with her own experiences with racism at TTN, Carter began to believe that there was a general hostility toward minorities in her office.  This belief was based on a series of events during Carter's employment with TTN.

Chicago:353864.1

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to what Plaintiff Carter believed.  Defendant denies any and all remaining allegations in Complaint Paragraph 19.

20.    For example, while on a business trip in December 2006 with Chicago Account Executives and the Chicago Office Manager, Carter was given a bag of pork rinds by Gerry Himmel ("Himmel") a male, non-African-American Account Executive.  When Carter asked why he got her pork rinds instead of the chocolate M&Ms that she asked for, the Account Executive responded "isn't this what you people eat?"  Although it was evident that Carter was deeply offended by the comment, neither Himmel nor Langan, the Chicago Office Manager, said a word about it.  Weeks later, Langan asked Carter if the comment bothered her.  When she indicated that it did, he told her he would let Human Resources know about the incident.

**ANSWER**:    Defendant admits that its investigation confirmed Plaintiff Carter's allegation that in December 2006 Account Executive Gerry Himmel gave Plaintiff Carter a bag of pork rinds while on a business trip.  Defendant admits that Himmel is a non-African-American male.  Defendant denies the remaining allegations in Complaint Paragraph 20.

Responding further, Defendant affirmatively states that it took immediate and appropriate action to investigate and address the incident described in Complaint Paragraph 20.

21.    In another example, on or about December 21, 2006, Carter was sitting in Langan's office discussing accounts.  Himmel entered Langan's office and asked Carter why "60% of African-American women in the City of Los Angeles between the age group of 25 and 34 are unmarried with four or more children."  Although offended, Carter responded that she did not know and tried to ignore Himmel.  Himmel then stated, in front of Langan, "What's up with that homie?"

**ANSWER**:    Defendant denies that the incident described in Complaint Paragraph 21 happened as characterized by Plaintiff Carter, and therefore denies the allegations in Complaint Paragraph 21.

Responding further, Defendant affirmatively states that it took immediate and appropriate action to investigate and address Plaintiff Carter's allegations of discrimination and harassment

upon becoming aware of her allegations.

22.     In another example, on December 28, 2006, Himmel walked into the office and commented that Carter had that "Samuel Jackson look going on."  A few hours later he addressed Carter with "Yo!" — stating that he knew she didn't like being addressed that way and then proceeding to ask her about the location of office supplies.

**ANSWER**:     Defendant denies that the incident described in Complaint Paragraph 22 happened as characterized by Plaintiff Carter, and therefore denies the allegations in Complaint Paragraph 22.

Responding further, Defendant affirmatively states that it took immediate and appropriate action to investigate and address Plaintiff Carter's allegations of discrimination and harassment upon becoming aware of her allegations.

23.     In yet another example, on January 5, 2007, Langan held an office sales meeting. At the meeting, Himmel addressed Harder and Carter and gave a mock sales presentation in a derogatory manner by mocking the Spanish language.  He then made derogatory and sarcastic remarks about Hispanics and African-Americans.

**ANSWER**:     Defendant denies that the incident described in Complaint Paragraph 23 happened as characterized by Plaintiff Carter, and therefore denies the allegations in Complaint Paragraph 23.

Responding further, Defendant affirmatively states that it took immediate and appropriate action to investigate and address Plaintiff Carter's allegations of discrimination and harassment upon becoming aware of her allegations.

24.     Carter also learned that racial hostility was not limited to her own office.  For example, on December 20, 2006, Langan had told Carter than TTN had prior problems with racial discrimination.  Further, Carter came to understand that the Milwaukee office manager refused to go on sales calls in African-American neighborhoods, and that he sent only African-American Account Executives on these calls.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to what Plaintiff Carter "learned."    Defendant denies any and all remaining allegations in Complaint Paragraph 24.

25.    While Carter was forced to endure racial discrimination, she was also subject to poor treatment on account of her gender.  During February of 2007, Langan commented to Carter, "you better close some business, Missy, and soon!"  This was not the first time that Langan called Carter "Missy."

**ANSWER**:    Defendant admits that Langan discussed with and encouraged Plaintiff Carter the need to bring in more accounts.  Defendant lacks knowledge or information sufficient to form a belief as to whether Langan ever referred to Plaintiff Carter as "Missy" during these discussions, and therefore denies same.  Defendant denies any and all remaining allegations in Complaint Paragraph 25.

26.    In another incident, Langan had told Carter that she could "ask some pretty dumb questions."  This was compounded by a previous incident where Langan told Carter that Atkinson spoke with Langan and referred to Carter as an "airhead."  Upon information and belief, this was one of several times in which Atkinson called women "airheads" and specifically referred to Carter in a derogatory manner.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 26.

27.    Carter often witnessed men demeaning other women in her office.  In fact, the first computer issued to Carter at the office when she was hired had a letter from a departing female employee on its complaining of a "sexist environment" or words to that affect.  The departing employee said she was leaving because "she couldn't take it anymore" or words to that affect.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to what Plaintiff Carter "witnessed."    Defendant denies any and all remaining allegations in Complaint Paragraph 27.

28.    Carter did not initially complain to Human Resources because of a comment that Langan had made to her.  Specifically, Langan told Carter that Shaffer [sic] thought Carter was "dumb" after Carter had spoken to her in October 2006 about a pay issue.  Langan also told Carter that she should try not to contact Shaffer for anything because it wouldn't be good for her."  However, on January 8, 2007, Langan and Shaffer [sic] spoke with Carter about the "pork rind" incident that occurred in December 2006.

**ANSWER:**    Defendant lacks knowledge or information sufficient to form a belief as to

why Plaintiff Carter did not complain to Human Resources.  Defendant denies that Norma Shafer

told anyone at any time that Plaintiff Carter was "dumb."  Defendant lacks knowledge or

information sufficient to form a belief as to whether Langan told Plaintiff Carter that she should

not contact Shafer because it would not be "good for her."  Defendant admits that Shafer and

Langan spoke with Plaintiff Carter on January 8, 2007 about the incident in December 2006

when Himmel gave Plaintiff Carter a bag of pork rinds.  Defendant denies any and all remaining

allegations in Complaint Paragraph 28.


29.    On or about January 11, 2007, Shaffer [sic] continued her conversation with Carter, where Carter conveyed to Shaffer [sic] the many incidents of discrimination that she had encountered at TTN.  During that conversation, Carter told Shaffer [sic], among other things, that she was suffering from discrimination based on her race and gender and that her work environment had become very hostile.  She also informed Shaffer [sic] that the discrimination that she was suffering was negatively affecting her ability to perform her job, and that she wanted a full investigation into the specific incidents that she was reporting and the discrimination that she was experiencing.  Lastly, she informed Shaffer [sic] that, in her opinion, the "pork rind" incident should have been dealt with by Langan when it happened, rather than weeks later.

**ANSWER**:    Defendant admits that Norma Shafer spoke with Plaintiff Carter by

telephone on January 12, 2007, and that the subject of their conversation was incidents where

Plaintiff Carter felt she was being discriminated against or harassed.  Defendant denies that

Plaintiff Carter described "many" incidents of discrimination.  Defendant admits that Plaintiff

Carter claimed that the incidents she described were discriminatory based on her race, and that

Chicago:353864.1

her work environment was hostile.  Defendant denies that Plaintiff Carter claimed that she was subjected to discrimination because of her gender.  Defendant denies that Plaintiff Carter claimed that her job performance was being negatively affected; that she demanded an investigation into any alleged incidents; or that Plaintiff complained that the "pork rind" incident was not handled quickly enough.  Defendant denies any and all remaining allegations in Complaint Paragraph 29.

     30.    Although Shaffer [sic] told Carter that the company "embraced diversity" and would investigate and remedy Carter's issues, she also asked Carter not to file a lawsuit.

     **ANSWER**:    Defendant admits that Shafer explained Defendant's policy of non-discrimination and non-harassment and that Shafer told Plaintiff Carter that the company would investigate and remedy the issues raised by Plaintiff Carter.  Defendant denies that Shafer asked Plaintiff Carter not to file a lawsuit.

     31.    This would not be the first time that Carter would be told not to pursue a lawsuit by TTN.  On or about January 12, 2007, Langan asked Carter not to file a lawsuit.  In that conversation, Langan told Carter that if she filed a lawsuit, the company stood a chance of losing a lot of money and that he would "go down for it too" or words to that affect.  Langan asked Carter to "think about [him] because [he] has two kids and it would be hard to find a job" or words to that affect.

     **ANSWER**:    Defendant denies that Plaintiff Carter was ever "asked not to pursue a lawsuit."  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 31.

     32.    Going forward, Carter felt uncomfortable with the pressure Langan had put on her.  For all intents and purposes, Carter felt like she did not have a manager anymore but rather, an interested party with a guilty conscious.  For the next few weeks, Langan continued to ask what Carter was going to do about "the situation."  To the best of Carter's knowledge, an investigation was not done into her many detailed complaints.

     **ANSWER**:    Defendant denies that an investigation was not conducted regarding

Chicago:353864.1

Plaintiff Carter's complaints. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 32.

## TTN Retaliates Against Carter for Filing Her Initial EEOC Charge

33.    Rather than investigate Carter's complaints and assist her in getting her career back on track, TTN began a destructive campaign of retaliation against Carter.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 33.

34.    For example, during the week of February 5, 2007, Langan began to have several meetings with Carter about her accounts and leads. Langan criticized Carter's accounts and the status of her leads and told her, "They are going to be on me" or words to that affect [sic]. Although he had never indicated this before Carter had conveyed her complaints of discrimination, Langan was now commenting that Carter was prospecting in the wrong geographical areas and not prospecting enough generally. Prior to filing her Charge of Discrimination and informing TTN of her complaints regarding discrimination, the company had provided Carter with largely positive feedback.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 34.

35.    Also in February 2007, Langan told Carter that he would be watching her more closely because "that was what the corporate office wanted." It was at this time that Carter believed that Human Resources was looking to "document her" into an eventual exist from the company.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 35.

Responding further, Defendant denies that its Human Resources Department, or any other employees of Defendant, intended to or began to improperly or unwarrantedly "document" Plaintiff in February 2007 or at any time during Plaintiff Carter's employment.

36.    On or about May 2, 2007, Carter's belief that TTN was trying to "document her" was confirmed by Langan. Langan informed Carter that he had written her a favorable

performance evaluation, however, Shaffer [sic] told him to re-write the evaluation in an unfavorable manner. Langan also explained to Carter that he was instructed by Shaffer [sic] not to give Carter the evaluation until after the First Quarterly Meeting in Orlando, Florida during the first week of April 2007. Langan explained that Shaffer [sic] was to present a "Discrimination in the Workplace" program at the meeting and that by that time, two new African American sales representatives were expected to be hired. Langan had all but said that he was told to hold the negative evaluation until TTN could be in a better position to rebut any claims of discriminatory conduct and/or retaliation.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 36.


37.    In addition, upon information and belief, some, if not all, of Carter's colleagues were informed of Carter's complaints and thereafter ostracized and belittled her. For example, a male Account Executive had an exchange with Langan in front of Carter in which Langan asked if he said anything that may be deemed inappropriate to which the male Account Executive responded, "no, you didn't say anything about her sex or race — you're good" or words to that affect.

**ANSWER**:    Defendant admits that in the course of investigating the allegations in

Plaintiff Carter's Charge of Discrimination, Defendant, of necessity to conduct a thorough

investigation, disclosed certain of Plaintiff Carter's allegations to individuals named in the

Charge or who otherwise had a need to know. Defendant denies any and all remaining

allegations in Complaint Paragraph 37.


**TTN Continues to Retaliate Against Carter for Filing Her Amended EEOC Charge**

38.    In April 2007, Carter hired the undersigned attorneys and filed an Amended Charge of Discrimination with the EEOC regarding new and more obstreperous treatment in her workplace on April 23, 2007. Within days of that filing, on or about April 25, 2007, management required Carter to submit to a self-evaluation of her performance. This "self-evaluation" was neither protocol nor previously required for any employees, including Claimant. Further, on information and belief, no other employees were ever subjected to such measures in evaluating performance. Carter alleges that this self-evaluation was simply another TTN's methods to amass documentation on her in order to more easily terminate her employment under the guise of a legitimate business decision.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to

when Plaintiff hired her attorneys, or the date that she filed her Amended Charge of

Discrimination with the EEOC.  Defendant admits that Plaintiff filed an Amended Charge with

the EEOC.  Defendant admits that in or around April 2007 Plaintiff was requested to perform a

self-evaluation, and that such a self-evaluation had not been requested or required previously

during Plaintiff Carter's employment.  Defendant denies that no other employees were requested

to prepare a self-evaluation and denies any and all remaining allegations in Complaint Paragraph

38.

 

 

       39.     Further, when Carter informed management that she believed that the activity was discriminatory and only served to document her in an effort to eventually terminate her, management, while attempting to refute her claims, threatened her job security by claiming that if she did not perform the evaluation, TTN would consider it "willful insubordination."  Thus, not only was Carter subject to what she alleges was a discriminatory and retaliatory activity, but if she refused to participate, she would be fired anyway.

       **ANSWER**:    Defendant admits that Plaintiff Carter initially refused to complete the

self-evaluation and that she claimed that she believed the self-evaluation was discriminatory.

Defendant denies that the self-evaluation was motivated by discriminatory animus or other

improper reasons.  Defendant admits that it told Plaintiff Carter that it would consider her

continued refusal to complete the self-evaluation to be insubordination.  Defendant denies that it

ever threatened or otherwise told Plaintiff Carter that she would be fired for failing to complete

the self-evaluation.  Defendant denies any and all remaining allegations in Complaint Paragraph

39.

 

 

       40.     Despite TTN's efforts to drive her out of the company, Carter was continuing to make strong in-roads into the communities she was canvassing.  Indeed, on or about May 2, 2007, Carter was in the late stages of obtaining a contract with a client that would have been a large account for her and her office.

       **ANSWER**:    Defendant denies that it was engaging in efforts to "drive [Plaintiff Carter]

out of the company." Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 40.

41.    The account was for Pinkston Child Care Academy, an African-American-owned company based out of Chicago that operates and manages childcare centers throughout the city. When Carter inquired as to whether the contract was ready for release, management informed her that they would not release the contract because of the client's "significant credit problems." Additionally, when Carter asked Harder whether he had been apprised as to the Pinkston account, he responded, "Yeah, his credit is real shitty."

**ANSWER**:    Defendant admits that Plaintiff Carter attempted to obtain a contract with Pinkston Child Care Academy.  On information and belief, Defendant admits that Pinkston Child Care Academy is an African-American owned company that operates and manages child-care centers in the Chicago area.  Defendant admits that a credit check of Pinkston Child Care Academy revealed a poor collection history.  Defendant denies any and all remaining allegations in Complaint Paragraph 41.

Responding further, Defendant affirmatively states that it approved the Pinkston Child Care Academy order, despite the results of the credit check, but that Pinkston Child Care Academy thereafter cancelled its order.

42.    In Carter's experience, no other Account Executive was required to run a credit check on their potential accounts.  Moreover, Carter could not recall any instance in which other potential clients were required to submit to a credit check before their business would be accepted.  Quite to the contrary, Carter knew that the office was starving for new accounts and each and every lead, let alone an account received, was a major event.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief regarding what Plaintiff could or could not "recall" regarding the requirement to submit potential clients to a credit check before accepting an order.  Defendant denies that no other account executives were required to run credit checks on their potential accounts.  Defendant denies any

and all remaining allegations in Complaint Paragraph 42.

43.     This action was discriminatory, not only with regard to Carter, but also with regard to the African-American client who was required to submit to additional measures prior to engaging TTN's services.  Further, Carter never observed her manager refer to or speak about any of her non-African-American counterparts' accounts in such a cavalier or disrespectful manner.  This type of treatment was clearly an effort by management to reduce the importance of Carter's hard work and only heightened Carter's awareness of the racial hostility that was rampant in the office.

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to what Plaintiff Carter "observed" in terms of "her manager's" discussions with her co-workers. Defendant denies any and all remaining allegations in Complaint Paragraph 43.

44.     Further, to her knowledge, Carter does not believe that the aforementioned client ever filled out a credit application for her or at Defendant's request, as it was not protocol to require the client to do so.  When she inquired as to how the client's credit was examined, management told Carter that it had used Experian to run the credit check, which is used primarily for individuals and consumers, but not with Dunn and Bradstreet, which is more commonly used to run the credit of businesses.  Further, Carter understands that Pinkston Child Care Academy's credit is very good.  Nonetheless, as a result of TTN's treatment of the client, Pinkston Child Care Academy itself inquired with Carter as to whether or not it could sue TTN for discriminatory business practices.

**ANSWER**:     Defendant admits that it used Experian to run the credit check for Pinkston Child Care Academy.  Defendant admits that it never requested or required Pinkston Child Care Academy to fill out a "credit application."  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegation that Pinkston Child Care Academy inquired with Plaintiff Carter as to whether or not it could sue Defendant.  Defendant denies any and all remaining allegations in Complaint Paragraph 44.

45.     TTN also resorted to outright intimidation in its attempts to force Carter out of the company.  On or about May 7, 2007, Carter's manager called her into his office and told her that he wanted to talk to her about moving accounts away from and between executives.  Carter

informed her manager that she thought a series of steps should be taken before taking an account away from an Account Executive. She further stated that if the Account Executive was doing a good job, she wondered why her manager would consider taking the account away from that Account Executive. Her manager then gave Carter the following example: "[Another Account Executive] has done a good job with Harper (a TTN client) and she could possibly do the same with Triton (Carter's client)." This tactic was clearly an effort by management to intimidate Carter and to demonstrate yet another way in which it would act to eradicate her business from the company, allowing management to terminate her for what would appear to be a purely business purpose.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 45.

46.    Finally, in or about June 2007, Respondent's Chicago and Milwaukee offices closed. The closures occurred while charges of discrimination were pending against management in the Chicago office. Further, upon information and belief, the African-American and female employees at the Milwaukee offices were subject to similar discriminatory treatment and may have logged complaints with TTN and/or filed Charges of Discrimination with the EEOC.[2]

**ANSWER**:    Defendant admits that it closed its Chicago and Milwaukee offices in June 2007 and that the closure occurred while Plaintiff Carter's EEOC Charge was pending. Defendant denies any and all remaining allegations in Complaint Paragraph 46, including those allegations found in footnote 1 below.

47.    Carter alleges that these closures were retaliatory in nature. Although unusual, Carter strongly believes that this fledgling company would rather shut offices down and take away the livelihood of its employees, including Carter and other individuals engaging in protected activities, rather than effectively deal with the rampant gender and racial discrimination that is ingrained in the company culture. Indeed, TTN is still operating in the regional area and continues to work with Chicago-based clients, including those formerly working with Carter.

**ANSWER**:    Defendant admits that its customers include companies that are based in Chicago, Illinois. Defendant lacks knowledge or information sufficient to form a belief as to

---

[2]    On or about May 18, 2007, one of Carter's former managers, who had worked for 8 months previous at the Milwaukee offices, informed her that the Milwaukee office manager refused to go on sales calls in African-American neighborhoods, and that he sent only African-American Account Executives on these calls. This manager's comment was unsolicited and voluntary.

what Plaintiff Carter "believes." Defendant denies any and all remaining allegations in

Complaint Paragraph 47.

48.    In sum, TTN's discriminatory and retaliatory actions taken against Carter, including disparaging her, "documenting her," issuing her inferior performance reviews, and ostracizing her were intended to interfere with her long-term career at TTN, damage her reputation with the company, and make her vulnerable for termination.  When Carter could not be forced out she was ultimately terminated off under the guise of an office closure.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 48.

**TTN Did Not Pay Carter Equally For Her Work**

49.    During her tenure, Carter was not paid commensurate with her performance, but also, as compared to her similarly situated male counterparts.  Carter was paid a lower salary than male employees in substantially equal jobs, including Langan, Harder, and Jerry [sic] Himmel, even though Carter performed similar duties requiring the same skill, effort, and responsibility of male employees.  Moreover, Carter received less compensation in terms of commissions as compared to her male counterparts due to her sex.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 49.

50.    The differential in pay between sexes was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 50.

51.    TTN intentionally paid Carter less than it paid male employees who were performing substantially equal work

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 49.

**Timely Representative Charges of Sexual Discrimination Were Filed Against Transit Television Network with the Equal Employment Opportunity Commission**

52.    Carter has filed timely representative charges of racial and sexual discrimination, and of unlawful retaliation against TTN with the EEOC.  The EEOC has issued Notices of Rights to Sue on the representative charges.[3]

**ANSWER**:    Defendant admits the allegations in Complaint Paragraph 52.

## Plaintiff Carter Suffered Extreme Emotional Distress

53.    By the acts and conduct described above, TTN intended to and did cause Carter severe emotional distress, or acted in reckless disregard such that it actions had caused and would cause Carter such injury.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 53.

54.    The acts and conduct of TTN toward Carter constitutes extreme and outrageous conduct beyond the bounds of common decency.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 54.

## Plaintiff Carter Was Injured as a Consequence of Defendants' Unlawful Conduct

55.    Plaintiff Carter lost wages and other benefits, suffered embarrassment and humiliation, and her career was irreparably injured as a result of TTN's conduct.  Carter suffered loss of enjoyment of life, inconvenience and other non-pecuniary losses as a direct result of TTN's conduct.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 55.

56.    The actions of TTN have caused and continue to cause Plaintiff Carter substantial losses in earnings, management opportunities and other employment benefits, in an amount to be determined by a jury.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 56.

---

[3]    Carter has requested a Right to Sue letter on her Charge of Unlawful Retaliation, which should be issued in the next few weeks.

57.     TTN acted or failed to act as herein alleged with malice or reckless indifference to the protected civil rights of Plaintiff Carter.  Plaintiff Carter is thus entitled to recover punitive damages in an amount to be determined by a jury.

**ANSWER**:     Defendant denies any and all allegations in Complaint Paragraph 57.

*Jennifer Krueger*

58.     Jennifer Krueger ("Krueger") began her employment with TTN on October of 2004 as an account executive in the Chicago office.  Plaintiff Krueger was hired at an annual salary of $40,000 plus commissions.  Krueger executed her job responsibilities diligently and competently, and enjoyed a good reputation with her clients and coworkers.  During her career, Krueger received excellent ratings on her performance reviews from her supervisors.  Her superior abilities and high level of sales earned her the title of Top Sales Executive during 2005. In fact, the closest salesperson to her level of sales was at least $50,000 in sales behind her.

**ANSWER**:  Defendant admits that Plaintiff Krueger was hired by Defendant on October

4, 2004 and that she was hired as an Account Executive in Defendant's Chicago Office.

Defendant admits that Plaintiff Krueger's initial salary was to be $40,000 plus commissions.

Defendant admits that Plaintiff Krueger's written performance reviews reflect positive

performance ratings.  Defendant denies any and all remaining allegations in Complaint

Paragraph 58.

59.     During her tenure, Krueger was not paid commensurate with her performance, but also, as compared to her similarly situated male counterparts.  Krueger was paid a lower salary than male employees in substantially equal jobs, including Langan, even though Krueger performed similar duties requiring the same skill, effort, and responsibility of male employees. On information and belief, some of Krueger's male counterparts, including Langan, were making almost double her salary.   Moreover, Krueger received less compensation in terms of commission as compared to her male counterparts due to her sex.

**ANSWER**:     Defendant denies any and all allegations in Complaint Paragraph 59.

60.     The difference in pay between men and women was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.  TTN intentionally paid Krueger less than it paid male employees who were performing substantially equal work.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 60.

61.    Evidence of TTN's intent to compensate women less than men for equal work can be found in comments made by then-Chief Executive Officer Gerry Noble who responded to Plaintiff Krueger's complaints of unequal pay by stating "you will never be able to get [men's wages] because there is a glass ceiling that you can't get over.  That is why I have to pay guys that are 35-40 top price" or words to that effect.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 61.

### *Lizbett Rodriguez*

62.    Lizbett Rodriguez ("Rodriguez") began her employment with TTN on April 11, 2005.  She was employed in the Chicago office as an Account Executive.  On information and belief, she was hired at the annual salary of $40,000 plus commission.  She executed her job responsibilities diligently and competently, and enjoyed a good reputation with her clients and coworkers.  She even won the title of Top Sales Executive during 2005 for her exquisite account management and service to the company.  During her tenure, Rodriguez was not paid commensurate with her performance, but also, as compared to her similarly situated male counterparts.  Rodriguez was paid a lower salary than male employees in substantially equal jobs, including Langan, despite her performance of similar duties requiring the same skill, effort, and responsibility of male employees.  On information and belief, Rodriguez was paid almost half the salary of her similarly situated male colleagues.  Moreover, Rodriguez received less compensation in terms of commission as compared to her male counterparts due to her sex.

**ANSWER**:  Defendant admits that Plaintiff Rodriguez was hired by Defendant on April

11, 2005, and that she was hired as an Account Executive in Defendant's Chicago office.

Defendant admits that Plaintiff Rodriguez's initial salary was to be $40,000 plus commissions.

Defendant denies any and all remaining allegations in Complaint Paragraph 62.

63.    The difference in pay between sexes was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 63.

Chicago:353864.1

64.    TTN intentionally paid Rodriguez less male employees who performed substantially equal work.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 64.

65.    Evidence of TTN's intent to compensate women less than men for equal work can be found in comments made by then-Chief Executive Officer Gerry Nobel who responded to Plaintiff Rodriguez's complaints of unequal pay by stating "well [equal pay] isn't going to happen … take it or leave it" or words to that effects.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 65.

**TTN was Aware of the Conduct of its Employees and Failed to Prevent Racial and Sexual Discrimination and Retaliation**

66.    TTN's management directed, encouraged and participated in the above-described unlawful conduct.  Further, TTN allowed the discrimination and retaliation to go unremedied for so long that it amounts to a policy or practice and constitutes TTN's standard operating procedure.  Finally, TTN's Human Resources Department failed to take appropriate remedial action and, in effect, aided and abetted in the unlawful conduct.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 66.

## COUNT I

### (INDIVIDUAL CLAIM OF CARTER)
### GENDER AND RACE DISCRIMINATION IN VIOLATION OF TITLE VII

67.    Plaintiff Carter realleges paragraphs 1 through 66 and incorporates them by reference as paragraphs 1 through 66 of Count I of this Complaint.

**ANSWER**:    Defendant restates and incorporates by reference its answers to Complaint Paragraphs 1 through 66.

68.    Title VII of the Civil Rights act of 1964, 42 U.S.C. Section 2000e *et seq.*, as amended by the Civil Rights Act of 1991 makes it unlawful to discriminate against any individual by denying the individual employment opportunities with respect to the terms, conditions, or privileges of employment on the basis of gender or race.

Chicago:353864.1

**ANSWER**:    Complaint Paragraph 68 is not a statement of fact, but is a legal

conclusion.  To the extent that a response is required, Defendant denies that Complaint

Paragraph 68 is a complete and accurate restatement of Title VII of the Civil Rights Act of 1964.


69.    By its conduct alleged herein, TTN engaged in unlawful employment practices under Title VII.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 69.


70.    TTN has allowed the unlawful conduct alleged herein to exist and to go unremedied for so long that it amounts to a policy or practice and constitutes TTN's standard operating procedure.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 70.

71.    As a direct and proximate result of TTN's unlawful actions, Plaintiff Carter has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 71.


## COUNT II

### (INDIVIDUAL CLAIM OF CARTER)
### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981

72.    Plaintiff Carter realleges paragraphs 1 to 71 and incorporates them by reference as paragraphs 1 to 71 of Count II of this Complaint.

**ANSWER**:    Defendant restates and incorporates by reference its answers to Complaint

Paragraphs 1 through 71.


73.    Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The terms "make and enforce contracts" includes the making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of contractual relationship.

**ANSWER**:    Complaint Paragraph 73 is not a statement of fact, but is a legal

conclusion.  To the extent that a response is required, Defendant denies that Complaint

Paragraph 73 is an accurate and complete restatement of 42 U.S.C. Section 1981.

74.    TTN engaged in race discrimination against Plaintiff Carter, an African-American, which constitutes illegal intentional race discrimination in violation of 42 U.S.C. Section 1981.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 74.

75.    Carter was subjected to and harmed by TTN's discrimination.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 75.

76.    As a direct and proximate result of TTN's unlawful actions, Plaintiff Carter has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliations and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 76.

## COUNT III

### (INDIVIDUAL CLAIM OF CARTER)
### RETALIATION IN VIOLATION OF TITLE VII AND THE EQUAL PAY ACT

77.    Plaintiff Carter realleges paragraphs 1 to 76 and incorporates them by reference as paragraphs 1 to 76 of Count III of this Complaint.

**ANSWER**:    Defendant restates and incorporates by reference its answers to Complaint

Paragraphs 1 through 76.

78.    Title VII, specifically 42 U.S.C. 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

**ANSWER**:    Complaint Paragraph 78 is not a statement of fact, but is a legal conclusion.  To the extent that a response is required, Defendant denies that Complaint Paragraph 78 is an accurate and complete restatement of Title VII.

79.    Plaintiff Carter complained of sexual and racial discrimination.

**ANSWER**:    Defendant admits that Plaintiff Carter complained of racial discrimination while employed with Defendant, and that Plaintiff Carter's Charges of Discrimination filed with the EEOC included allegations of race discrimination and sex discrimination.  Defendant denies that Plaintiff Carter ever complained of sex discrimination while she was employed with Defendant.  Defendant denies any and all remaining allegations in Complaint Paragraph 79.

80.    By its conduct alleged here, TTN unlawfully retaliated against Plaintiff Carter for her complaints in violation of the anti-retaliation provisions of Title VII.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 80.

81.    The unlawful employment practices alleged herein were intentional and were performed by TTN with malice or reckless indifference to TTN's obligations under Title VII.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 81.

82.    As a direct and proximate result of TTN's unlawful actions, Plaintiff Carter has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 81.

Chicago:353864.1

## COUNT IV

## VIOLATION OF THE EQUAL PAY ACT

83.    Plaintiffs reallege paragraphs 1 through 82 and incorporate them by reference as paragraphs 1 through 82 of Count IV of this Complaint.

**ANSWER**:    Defendant restates and incorporates by reference its answers to Complaint Paragraphs 1 through 82.

84.    The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. Section 206 and 207, makes it unlawful for an employer on the basis of sex to pay lower wages or fringe benefits to employees of one sex than it does to similarly situated employees of the other sex.

**ANSWER**:    Complaint Paragraph 84 is not a statement of fact, but is a legal conclusion.  To the extent that a response is required, Defendant denies that Complaint Paragraph 84 is an accurate and complete restatement of the Equal Pay Act, 29 U.S.C. Sections 206 and 207.

85.    By its conduct alleged herein, TTN willfully and knowingly engaged in unlawful employment practices under the Equal Pay Act.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 85.

86.    As a direct and proximate result of TTN unlawful conduct, Plaintiffs suffered damages.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 86.

## COUNT V

## RETALIATION IN VIOLATION OF THE EQUAL PAY ACT

Chicago:353864.1

87.    Plaintiffs reallege paragraphs 1 to 86 and incorporate them by reference as paragraphs 1 to 86 of Count V of this Complaint.  The Equal Pay Act provisions of the Fair Labor Standards Act also forbids employers from engaging in retaliatory conduct.

**ANSWER**:    Defendant restates and incorporates by reference its answers to Complaint Paragraphs 1 through 82.  Defendant states that the second sentence of Complaint Paragraph 87 is not a statement of fact, but is a legal conclusion.  To the extent that a response is required to the second sentence of Complaint Paragraph 87, Defendant denies that such sentence is a complete and accurate restatement of the Equal Pay Act.

88.    Plaintiffs complained of discrimination in unequal pay.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 88.

89.    By its conduct alleged here, TTN unlawfully retaliated against Plaintiffs for their complaints in violation of the anti-retaliation provisions of The Equal Pay Act.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 89.

90.    The unlawful employment practices alleged herein were intentional and were performed by TTN with malice or reckless indifference to TTN's obligations under Title VII.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 90.

91.    As a direct and proximate result of TTN's conduct, Plaintiffs suffered damages.

**ANSWER**:    Defendant denies any and all allegations in Complaint Paragraph 91.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Court find in their favor and against Defendant as follows:

a.      Enter an appropriate injunction compelling TTN to cease and desist from the wrongful practices herein alleged and hereafter established;

b.      Declare that the acts and conduct of TTN violates the anti-retaliation provisions of Title VII and the Equal Pay Act provisions of the Fair Labor Standards Act;

c.      Award Plaintiffs the value of all compensation and benefits lost as a result of Defendant's unlawful conduct under the Equal Pay Act;

d.      Award Plaintiffs liquidated damages under the Equal Pay Act;

e.      Award Plaintiffs prejudgment interest;

f.      Award Plaintiffs reasonable attorneys' fees, costs and disbursements; and

g.      Award Plaintiffs such other relief as this Court deems just and proper.

**ANSWER**:      Defendants deny any and all factual allegations contained in Plaintiffs'

Prayer for Relief, and deny that Plaintiffs are entitled to any relief whatsoever.

## Individual Relief

h.      Plaintiff Carter incorporates by reference paragraphs (a) through (g) as paragraphs (a) through (g) of the prayer for relief for their individual claims, and in addition respectfully request that the court;

i.      Award the present value of all compensation and benefits she will lose in the future as a result of Defendant's unlawful conduct;

j.      Award compensatory damages;

k.      Award punitive damages;

l.      Award liquidated damages;

m.      Award prejudgment interest;

n.      Award reasonable attorneys' fees, costs and disbursements;

o.      Award such other relief as this Court deems just and proper.

**ANSWER**:      Defendant denies any and all factual allegations contained in

subparagraphs h through o of Plaintiff Carter's Prayer for Individual Relief, and denies that

Plaintiff Carter is entitled to any relief whatsoever.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

**ANSWER**:    Defendant admits that Plaintiffs have demanded a trial by jury.  Defendant denies that Plaintiffs are entitled to a trial by jury for some or all of their causes of action and to the extent that Plaintiffs seek equitable relief.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

With respect to some or all of Plaintiffs' claims, Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs failed to conciliate the charged pursuant to their obligations under 42 U.S.C. § 2000e-5(b).

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that they exceed the scope of or are inconsistent with the Charges of discrimination filed by Plaintiff Carter with the Equal Employment Opportunity Commission.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by applicable statutes of limitation, to the extent they were not presented by Plaintiff Carter in a timely fashion to the Equal Employment Opportunity Commission for administrative resolution, and to the extent that they

Chicago:353864.1

did not occur within the time frames prescribed by law under Title VII, Section 1981, or the Equal Pay Act.

## FIFTH AFFIRMATIVE DEFENSE

Although Defendant denies that any discrimination occurred, Defendant reserves the right to assert a mixed motive defense.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs failed to mitigate their damages as required by law, or , in the alternative, have mitigated their damages, thereby reducing any damages claimed by Plaintiffs herein.

## SEVENTH AFFIRMATIVE DEFENSE

Although Defendant denies that any racial or sexual harassment occurred, Plaintiff Carter's claims of racial and sexual harassment are barred by the doctrines of estoppel and/or waiver to the extent that Plaintiff Carter failed to notify or complain to Defendant of the allegations asserted in Plaintiffs' Complaint.

## EIGHTH AFFIRMATIVE DEFENSE

Although Defendant denies that any racial or sexual harassment occurred, Plaintiff Carter's claims of racial or sexual harassment are barred by the doctrines of estoppel and/or waiver to the extent that Plaintiff Carter failed to adhere to Defendant's EEO policy.

## NINTH AFFIRMATIVE DEFENSE

Although Defendant denies that any racial or sexual harassment occurred, Plaintiff Carter's claims of sexual harassment are barred by the doctrines of estoppel and/or waiver to the extent that Plaintiff Carter failed to give Defendant an opportunity to investigate and take appropriate remedial action concerning the allegations asserted in Plaintiffs' Complaint.

Chicago:353864.1

## TENTH AFFIRMATIVE DEFENSE

The relief sought by Plaintiff may be barred, in whole or in part, by the after-acquired evidence doctrine.

## ELEVENTH AFFIRMATIVE DEFENSE

All employment decisions regarding or affecting Plaintiffs were based upon legitimate, non-retaliatory, and reasonable business reasons.

## TWELFTH AFFIRMATIVE DEFENSE

Defendant reserves the right to assert additional defenses and affirmative defenses as may appear applicable during the course of this litigation.

Respectfully submitted,


s/ Becky L. Kalas
Attorney for Defendant
Becky L. Kalas
IL ARDC#: 6279983


Michael W. Duffee
Becky L. Kalas
FORD & HARRISON LLP
55 East Monroe Street
Suite 2900
Chicago, IL  60603-5709
(312) 332-0777 (phone)
(312) 332-6130 (fax)

Dated: January 24, 2008

Chicago:353864.1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT was filed electronically with the Northern District of Illinois on January 24, 2008, and is available for viewing and downloading from the Electronic Case Filing (ECF) System.  The undersigned also certifies that the foregoing ANSWER was delivered to the courtroom deputy of Judge Leinenweber on the date of filing.

Service of this ANSWER was accomplished electronically through the ECF System on the following ECF registered filing users:

Ethan G. Zelizer (ezelizer@sfltd.com)

Jasmine Emon Simmons (jsimmons@sfltd.com)

s/ Becky L. Kalas
Attorney for Defendant
Becky L. Kalas
IL ARDC#: 6279983

Michael W. Duffee
Becky L. Kalas
FORD & HARRISON LLP
55 East Monroe Street
Suite 2900
Chicago, IL  60603-5709
(312) 332-0777 (phone)
(312) 332-6130 (fax)

Dated: January 24, 2008